IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MMODAL SERVICES LTD., )
)
Plaintiff, )
)                    Case No.: 1:18-cv-0091-WMR
v. )
)
)
NUANCE COMMUNICATIONS, INC., )
)
Defendant. )

**SPECIAL MASTER'S REPORT AND RECOMMENDATION
REGARDING NUANCE'S MOTION TO DISMISS UNDER
FED. R. CIV. P. 12(b)(6) AND MOTION TO STRIKE UNDER RULE
12(f), OR IN THE ALTERNATIVE TO BIFURCATE AND
STAY UNDER FED. R. CIV. P. 42(b)**

Pursuant to this Court's Order dated September 30, 2020 (Doc. 188), the

following is the report and recommendation from the undersigned Special Master

regarding Defendant Nuance Communications, Inc.'s ("Nuance") Motion to

Dismiss Under Fed. R. Civ. P. 12(b)(6) and Motion to Strike Under Rule 12(f), or

in the Alternative to Bifurcate and Stay Under Fed. R. Civ. P. 42(b).  Nuance is

seeking to dismiss the Third Counterclaim-in-Reply ("Declaratory Judgment of

Unenforceability of the '403 Patent"), the Fourth Counterclaim-in-Reply

("Monopolization, *Walker Process* Fraud, Section 2 of the Sherman Act (15 U.S.C. § 2)") and the Fifth Counterclaim-in-Reply ("Attempted Monopolization, *Walker Process* Fraud, Section 2 of the Sherman Act (15 U.S.C. § 2)") (collectively, the "Counterclaims") set forth in MModal's Answer to Nuance's Counterclaim and Counterclaims-in-Reply (Dkt. No. 143-2).  Nuance also seeks to strike MModal's Third, Fourth, Fifth and Sixth Defenses (collectively, the "Defenses") set forth in MModal's Answer to Nuance's Counterclaim (Dkt. No. 128).  All of the Counterclaims and Defenses sought to be struck or dismissed involve the core issue of whether Nuance's asserted U.S. Patent No. 8,738,403 (the "'403 Patent") was obtained from the Patent Office as a result of Nuance's inequitable conduct in failing to name all of the co-inventors of the patent.

This report and recommendation follows a careful review of the respective pleadings and the parties' presentations at a hearing on the motion held on December 15, 2020.

## I.  Legal Standards

### A.  Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for

relief. *Shroyer v. New Cingular Wireless Servs., Inc.,* 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *TAGI Ventures, LLC v. NASCAR Digital Media, LLC,* 2017 WL 3469527, at *4 (N.D. Ga. 2017). However, the factual allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Bell Atl, Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir.2011) (a complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and will warrant dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663. All of these principles apply with equal force both to a claim stated in a complaint and a counterclaim stated in a responsive pleading. *See Starr, supra.*

### B.    Motion to Strike

As stated in *Hernandez v. Ticketmaster, LLC*, 2018 WL 2198457, at *1

(S.D. Fla. 2018) (citations omitted):

> Under the Federal Rules of Civil Procedure, the Court may strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are generally disfavored and are usually denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties. . . . Affirmative defenses fall under the general pleading requirements of Rule 8 of the Federal Rules of Civil Procedure and should be stricken if they fail to recite more than bare-bones conclusory allegations. . . .  Affirmative defenses should be stricken when they are insufficient as a matter of law. . . . A defense is legally insufficient only if the pleading on its face is patently frivolous, or it is clearly invalid as a matter of law. . . .

## II.   Background

MModal filed a Complaint in this Court against Nuance for alleged infringement of four of MModal's U.S. patents.  Nuance  answered and counterclaimed, alleging infringement of two of its patents, including the '403 Patent.[1]  Dkt. No. 43.  MModal then filed its Answer to Nuance's Counterclaim and Counterclaims-in-Reply ("Counterclaims").  Dkt. No. 143-2.

---

[1] The '403 Patent is directed to a "computer-implemented method for deriving additional information from a freeform clinical narrative" that "provid[es] the user with options," such as unspecified concepts based on the facts, "and update[s] a textual representation of the narration, to reflect the user's selection." DKt. No. 43, at ¶ 29.

The following excerpt from MModal's Counterclaims sets out, in part, the grounds for it alleging inequitable conduct regarding the '403 Patent inventorship:

19.    In the fall of 2010, Nuance and 3M [Company], MModal's now-parent company, began working together on the computer-assisted physician documentation ("CAPD") technology that underlies the '403 Patent. The goal was to integrate Nuance's clinical language understanding ("CLU") speech recognition technology with 3M's clinical document improvement solutions ("CDIS"), which did not have speech recognition capability. 3M's CDIS technology enables more accurate clinical records by providing users with three types of queries: specificity, clarification, and linkage. With respect to specificity queries, 3M's CDIS technology provides users with prompts and queries for, among other things, more specificity regarding medical facts and diagnoses. For example, if a clinical report indicates that a patient suffered from "heart failure," 3M's CDIS technology would prompt the user to specify the "acuity" (e.g., acute or chronic) and "type" (e.g., systolic or diastolic) of heart failure. This technology helps ensure that a medical record has particularized and complete patient data.

20.    By October 27, 2010, 3M and Nuance had agreed to code name the CAPD joint-development project "Prodigy." On November 2, 2010, 3M and Nuance memorialized the Prodigy project in a written agreement, where Nuance agreed not to use 3M's confidential information to create any "derivative works.". . . (the "Confidentiality Agreement"). One goal of the Prodigy project was to develop a CAPD demonstration to jointly present at the Healthcare Information and Management Systems Society 2011 ("HIMSS- 2011") conference on February 20-24, 2011, in Orlando, Florida.

21.    Between November 30 and December 1, 2010, 3M and Nuance met in- person in Boston, Massachusetts regarding Prodigy. During those meetings, Nuance and 3M discussed objectives and strategies to combine the complementary technologies from the two parties and develop the CAPD technology. In Boston, 3M showed Nuance a PowerPoint presentation detailing how 3M's technology enables users to provide physician-facing queries and prompts. 3M subsequently sent that presentation to Nuance. Keith C. Mitchell was the 3M

technical lead on the Prodigy project, including with respect to forming physician-facing queries and prompts and integrating them with Nuance's CLU technology. 3M and Nuance had further in-person Prodigy meetings in Atlanta, Georgia between January 5-7, 2011.

22.     Beyond the in-person meetings, 3M and Nuance employees exchanged hundreds of emails and collaborated in drafting dozens of technical documents related to CAPD technology. This exchange and collaboration occurred in order to develop the CAPD technology as part of the Prodigy project.

23.     On February 14, 2011, 3M and Nuance executed a contract governing the rights and responsibilities of each party in their efforts to jointly develop CAPD technology (the "Master Agreement") [MModal's Exh. F, Dkt. No. 182-2] . . . . The Master Agreement is a valid and enforceable contract between 3M and Nuance. In the Master Agreement, both 3M and Nuance stated that they did "not expect there to be any joint intellectual property developed as a result of" their collaboration, and agreed that, absent a separate arrangement, "in the event jointly developed intellectual property is created . . . then such joint intellectual property shall be jointly owned." . . . There were no other written agreements between the parties with respect to ownership of jointly developed intellectual property.

24.     On February 16, 2011, 3M and Nuance issued a joint press release about the Prodigy project:

> 3M Health Information Systems and Nuance Communications, Inc., today announced a broad strategic partnership to deliver Computer-Assisted Physician Documentation, a next generation, ICD-10-ready clinical documentation improvement (CDI) solution. Powered by Nuance's advanced speech recognition and Clinical Language Understanding (CLU) technologies, and integrating 3M's extensive CDI content and expertise, Computer-Assisted Physician Documentation (CAPD) represents a major leap forward in technology to streamline clinical workflow, increase coding accuracy and efficiency, and meet complex ICD-10 documentation requirements.

25.     Both Nuance and 3M publicly presented their jointly created CAPD technology during the HIMSS-11 Conference in Orlando, Florida, which lasted from February 20-24, 2011.

26.     On February 18, 2011—after months of collaboration with 3M, four days after signing the Master Agreement, and two days before the HIMSS-11 Conference where the joint CAPD project would be presented—Nuance improperly filed the patent application that would ultimately become the '403 Patent, along with four additional patent applications covering the jointly developed technology (collectively, the "CAPD Applications"). [Footnote omitted].  Every one of those applications related to CAPD technology that 3M employees had helped invent. Yet Nuance never informed 3M that it intended to file, let alone had filed, any patent applications on the jointly developed technology. Worse, Nuance did not list any 3M employees as inventors on those applications, even though Nuance had a duty to the Patent Office to disclose all inventors of the claimed technology.

27.     The timing was no accident. Nuance rushed to secretly file the five CAPD Applications less than 48 hours before the HIMSS-11 Conference in order to secure a filing date before its public demonstration of the CAPD technology with 3M.

28.     Despite Nuance's attempt to claim the technology for itself, 3M employees contributed to the conception of numerous claims of the '403 Patent and contributed significantly to developing the claimed invention as a whole. 3M and its employees, including Keith C. Mitchell, contributed to the conception of at least claims 1, 2, 4, 6, 9, 11, 13, 16, 17, 19, 21, 24, 26, 28, 31, 32, 34, 36, 39, 41 and 43 of the '403 Patent as part of their work related to the Prodigy CAPD project.

29.     Claims 1, 16, and 31 (and all claims that depend from them) of the '403 Patent recite "providing to a user the one or more options corresponding to the one or more clinical facts corresponding to the one or more abstract semantic concepts identified from the processing of the free-form narration." 3M and its employees provided the technical and clinical know-how and proprietary information to integrate the functionality of "providing to a user the one or more options corresponding to the one or more clinical facts corresponding to the one or more abstract semantic concepts identified from the processing of the free-form narration" into Nuance's CLU platform.

For example, 3M sent Nuance a document that said, "Considering the specificity of the red underlined text, is there evidence of: systolic congestive heart failure Diastolic congestive heart failure; systolic and diastolic congestive heart failure."

30.    Dependent claims 2, 17, and 32 of the '403 Patent recite "wherein the providing comprises providing a visual listing of the one or more options." As explained above, 3M's contributions to the physician-facing query functionality included providing a visual listing of the one or more options. Likewise, dependent claims 6, 26, and 36 recite "wherein the first fact is a more specific version of a second fact specified in the free-form narration as having been ascertained from the patient encounter."

\* \* \*

36.    Keith C. Mitchell [3M's assigned technical lead for the joint project] was undoubtedly a co-inventor of the technology Nuance claimed in the '403 Patent.  Yet Nuance intentionally omitted his name from its patent application and accompanying declarations, and failed to disclose his involvement to the Patent Office. By failing to disclose to the Patent Office an inventor who contributed to the conception of the '403 Patent's claims, Nuance omitted information that is material to  patentability.

## III.   Analysis

### A.   Motion to Dismiss

#### 1.   Inequitable Conduct Counterclaim

Nuance moves to dismiss the Third Counterclaim-in-Reply ("Declaratory Judgment of Unenforceability of the '403 Patent") which is based upon a claim of inequitable conduct.  Fed. R. Civ. P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." "[I]nequitable conduct, while a broader concept than fraud, must be

pled with particularity" under Rule 9(b).  *Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega Sys., LLC,* 350 F.3d 1327, 1344 (Fed. Cir. 2003).

The pleading requirements for an inequitable conduct claim are two distinct inquiries: (1) particularity in the circumstances constituting the fraud and (2) materiality and intent.  *Exergen Corp. v. Wal-Mart Stores, Inc.,* 575 F.3d 1312, 1328-9 (Fed. Cir. 2009).

> [T]o plead the "circumstances" of inequitable conduct with the requisite "particularity" under Rule 9(b), the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO.  Moreover, although "knowledge" and "intent" may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

*Id.  See also Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1365 (Fed. Cir. 2008); *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178, 1181 (Fed. Cir. 1995); 37 C.F.R. § 1.56 (2008).

a.   **Particularity in the Circumstances of the Inequitable Conduct**

i.   **Who**

To satisfy the "who" of an inequitable conduct claim, the pleading must name "the specific individuals associated with the filing or prosecution of the application issuing" as the patent. *Exergen, supra,* at 1329. In Paragraphs 33-35 of its Counterclaims, MModal identifies "James R. Flanagan of Nuance" as the author of at least three emails to 3M personnel who were involved in the joint project. MModal did not specifically identify Mr. Flanagan as the "who," but he is listed as the first co-inventor on the '403 Patent. As such, Mr. Flanagan would have been "associated with the filing or prosecution of the application issuing" as the '403 Patent and is a "specific individual" that the court "may reasonably infer knew of invalidating information that was withheld from the PTO." *Delano Farms Co. v. Ca. Table Grape Comm'n,* 655 F.3d 1337, 1350 (Fed. Cir. 2011). Therefore, MModal satisfied the pleading of the "who" component of inequitable conduct.

ii.   **"What" and "Where"**

The "what" and "where" requirements necessitate that a pleading "identify which claims, and which limitations to those claims, . . . the material information is found." *Exergen, supra* at 1329. In order to qualify as an inventor, a person

must contribute to the conception of at least one claim.  *See, e.g., Vanderbilt Univ. v. ICOS Corp.,* 601 F.3d 1297, 1303–04 (Fed. Cir. 2010).  It can be seen that above paragraphs 28-30 of the Counterclaims satisfy the "what" and "where" requirements in that those paragraphs identify the claims of the '403 Patent MModal asserts 3M personnel "contributed to the conception" of and what that respective contribution was.

### iii.   "Why" and "How"

For the "why" and "how," the pleading must explain why "the withheld information is material and not cumulative" and how "an examiner would have used this information in assessing the patentability of the claims."  *Id.* at 1329–30. Paragraphs 36 - 38 of MModal's Counterclaims satisfy the "why" and "how" requirements because, as explained in *PerSeptive Biosystems, Inc. v. Pharmacia Biotech Inc.,* 225 F.3d 1315, 1321 (Fed. Cir. 2000):

> As a critical requirement for obtaining a patent, inventorship is material. *See, e.g.,* 35 U.S.C. § 102(f) (1994) ("A person shall be entitled to a patent unless . . . he himself did not invent the subject matter sought to be patented."); 35 U.S.C. § 116 ("When an invention is made by two or more persons jointly, they shall apply for a patent jointly.").  Examiners are required to reject applications under 35 U.S.C. § 102(f) on the basis of improper inventorship. *See* Manual of Patent Examining Procedure § 2137.01 (hereinafter "MPEP"). Accordingly, the Manual of Patent Examining Procedure details the "rules" of inventorship to be used by examiners, *see id.,* and

specifically notes that information about inventorship is material
under 37 C.F.R. § 1.56, *see* MPEP § 2001.06(c) (inventorship disputes
are material information); MPEP § 2004 (suggesting that applicants
carefully consider inventorship in the duty to disclose context).

In view of the above, MModal sufficiently pleaded the "circumstances" of

inequitable conduct with the requisite "particularity" under Rule 9(b).

### b.   Materiality and Intent

To establish the second prong of pleading inequitable conduct, namely,

materiality and intent,

> [a] pleading of inequitable conduct also must "allege sufficient
> underlying facts from which a court may reasonably infer that a party
> acted with the requisite state of mind." *Exergen,* 575 F.3d at 1327. In
> order to survive a motion to dismiss, [MModal] need only state facts
> that give rise to a reasonable inference that an individual knew of the
> withheld material information and withheld the information with the
> intent to deceive the PTO. *See id.* at 1328–29. "A reasonable
> inference is one that is plausible and flows logically from the facts
> alleged, including any objective indications of candor and good
> faith." *Id.* at 1329 n. 5.

*Cyber Acoustics, LLC v. Belkin Intern., Inc.*, 988 F. Supp.2d 1236, 1245 (D.

Oregon 2013); *see also Delano Farms, supra* (a party must recite "facts from

which the court may reasonably infer that a specific individual both knew of

invalidating information that was withheld from the PTO and withheld that

information with a specific intent to deceive the PTO.").[2]

> [I]nformation is material if there "is a 'substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.'" *Baxter* [*Intern., Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1327 (Fed. Cir. 1998)], 47 USPQ2d at 1229 (quoting 37 C.F.R. § 1.56 (1989)); *see also J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1559, 223 USPQ 1089, 1092 (Fed. Cir. 1984). [A]n examiner must attend to the question of inventorship, pursuant to 35 U.S.C. § 102(f). A full and accurate disclosure of the true nature of the relationship between [Nuance] and [3M], and the contributions of [3M personnel, such as Mr. Keith C. Mitchell], would have been "important" to a reasonable examiner's consideration of the inventorship question.

*PerSeptive, supra* at 1321-22.

"The intent element of fraud . . . may be proven by a showing of acts the natural consequences of which are presumably intended by the actor. . . . The duty of candor owed the PTO being uncompromising, it would deal a deathblow to that duty if direct proof of wrongful intent were required. . . ." *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed. Cir. 1983).

---

[2] "On the merits, [MModal] will be required to show that [Nuance's] intent to deceive is 'the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard.' . . . That level of specificity, however, is not required at the pleading stage of a claim of inequitable conduct." *Cyber Acoustics, supra* at 1247; *see also Milburn v. U.S.,* 734 F.2d 762, 765 (11th Cir. 1984) (A pleading "should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief.").

MModal sets out in paragraph 37 of its Counterclaims that the Nuance co-inventors had knowledge of their obligation to include the 3M co-inventor(s) to the Patent Office in view of the declaration that each signed on the filing of the application that matured into the '403 Patent which certified that they "believe that I/we are the original and first inventor(s) of the subject matter which is claimed and for which a patent is sought." Yet, despite that knowledge, MModal pleads that Nuance filed the application "claiming the technology that 3M co-developed" but "intentionally omitted 3M inventors form its patent application and submitted false declarations to the PTO about inventorship." Counterclaims, ¶¶ 36-38.

In view of the above, MModal has pled sufficient facts from which a court may reasonably infer that the Nuance co-inventors, although aware of their duty of candor to the Patent Office, both knew of invalidating information that was withheld from the Patent Office and withheld that information with a specific intent to deceive the Patent Office (*see* Counterclaims, at ¶¶ 92, 93 and 106), thereby satisfying the materiality and intent prong of pleading inequitable conduct. Under Rule 9(b), "it is sufficient to plead 'the who, what, when, where and how' of the allegedly fraudulent statements or omissions and then allege generally that those statements or omissions were made with requisite intent." *McCabe v. Daimler AG*, 948 F. Supp.2d 1347, 1367 (N.D. Ga. 2013).

14

In support of its motion to dismiss, Nuance has cited to two factual allegations which are beyond the pleadings.  First, Nuance argues that "[d]espite knowing in 2012 that Nuance filed the application that issued as the '403 patent, and knowing no later than 2015 that the '403 patent had issued, 3M thought so little of the merits of its inventorship and ownership claim that it did not – and to this day has not – taken any legal action to enforce them."  Nuance Opening Brief, at page 1.  As a result of 3M never diligently pursuing "any legal action to protect its purported inventorship rights," Nuance contends that 3M is barred by laches from asserting them now.

Nuance also argues that "although MModal tells this Court now that the '403 Patent is directed to an invention that 3M employees helped to conceive," MModal filed an *inter partes* review ("IPR") petition in the U.S. Patent Trial and Appeal Board (PTAB") asserting that every '405 Patent claim Nuance has asserted in this action plus additional claims were unpatentable in view of certain prior art. Nuance Exh. A (Dkt. No. 181-2).  Subsequently, after 3M acquired MModal (*see* Nuance Exh. B (Dkt. No. 3), they jointly filed a reply to MModal's response to the petition. Nuance Exh. C (Dkt. No. 181-4).  In a May 13, 2020 Final Written Decision, the PTAB largely agreed with MModal and 3M and cancelled almost all of the challenged claims as being unpatentable in view of that prior art.  Nuance Exh. D (181-5).

As a result of that Final Written Decision, Nuance asserts that MModal and Nuance are judicially estopped from pursuing their inventorship theory, because the '403 Patent claims cancelled by the PTAB "include every limitation that MModal attempts to attribute to the contributions of 3M employees," citing *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004) ("contribution of information in the prior art cannot give rise to joint inventorship because it is not a contribution to conception.").

> MModal is now estopped from taking the contrary position that the subject matter in the cancelled claims is not in the prior art, and that 3M employees contributed something inventive to those claims. MModal's inventorship and ownership theories are thus doomed as a matter of law and its Counterclaims fall with them.

Nuance Opening Brief, at 3.

By arguing that 3M is barred by laches and that MModal is judicially estopped from asserting inequitable conduct because of the IPR Decision, Nuance is basically advancing a "no foul, no harm" defense.   However, "inequitable conduct is not magically erased" by the occurrence of Nuance's allegations. *A.B. Dick Co. v. Burroughs Corp.*, 617 F. Supp. 1382, 1397 (N.D. Ill. 1985); *see also PerSeptive, supra* at 1321-22 (argument that the patent-in-suit's claims were narrowed during prosecution "misses the point," because "whether the inventorship of the patent as issued is correct does not determine the materiality of the statements" made to the Patent Office).   For purposes of determining Nuance's

16

motion to dismiss as to the claim of inequitable conduct, the focus at this stage is on whether the identification of the specific "who, what, when, where and how" of the material misrepresentation or omission committed by Nuance before the Patent Office has been pleaded in the Counterclaims with particularity (*i.e.,* in detail), and not on the truth of the matters stated therein.

MModal's factual allegations of the claim of inequitable conduct by Nuance are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Therefore, it is recommended that Nuance's motion to dismiss the Third Counterclaim-in-Reply ("Declaratory Judgment of Unenforceability of the '403 Patent") be **DENIED**.

## 2. **Antitrust Counterclaims**

Nuance also moves to dismiss the Fourth Counterclaim-in-Reply ("Monopolization, *Walker Process* Fraud, Section 2 of the Sherman Act (15 U.S.C. § 2)) and the Fifth Counterclaim-in-Reply ("Attempted Monopolization, *Walker Process* Fraud, Section 2 of the Sherman Act (15 U.S.C. § 2)"). "*Walker Process* Fraud" refers to the Supreme Court case of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), which held that enforcement of a fraudulently procured patent violated the antitrust laws and provided a basis for a claim of treble damages if it caused a substantial

anticompetitive effect.  In other words, "[MModal's] counterclaim allege[s] that [Nuance] obtained the ['403] patent by knowingly and willfully misrepresenting facts to the Patent Office.  Proof of this assertion would be sufficient to strip [Nuance] of its exemption from the antitrust laws."  *Walker Process, supra* at 177.

"To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act, it [is] necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved."  *Id.*; *see also Morris Communications, Inc. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004).  More specifically, "[a]ntitrust injury is made up of [5] elements: (1) unlawful conduct, (2) causing an injury to plaintiffs, (3) that flows from that which makes the conduct unlawful, . . . (4) that is of the type the antitrust laws were intended to prevent ... [and] (5) that the injured party be a participant in the same market as the alleged malefactors."  *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003).

MModal asserts that Nuance's "unlawful conduct" is that "Nuance seeks to oust MModal from the relevant market, and is trying to do so in part by asserting a fraudulently obtained patent against its only remaining significant competitor."  Counterclaims, at ¶ 5.  In paragraphs 56-58, 109-10 and 115-15 of the Counterclaims, Nuance sets out the bases for its allegation that Nuance is engaged

in anticompetitve conduct by asserting against MModal the fraudulently obtained '403 Patent.

Under the headings "The Relevant Market" and "Nuance's Market Power," MModal sets out in paragraphs 63-77 of the Counterclaims the facts upon which it contends that Nuance has monopoly power in the relevant market for ASR ["Automated Speech Recognition"] healthcare software (¶ 63), including that "Naunce accounts for over 70% of all shares of commercial ASR software and has a higher share still of the relevant market for ASR healthcare software in the United States" and that "3M, through its subsidiary MModal, is Nuance's principal competitor." ¶ 75; *see also* ¶ 74. Additionally, MModal asserts, in paragraph 4 of the Counterclaims, that Nuance, "weeks after asserting the fraudulently procured '403 Patent against MModal in this case, observed in its healthcare quarterly review [that] 'Nunace has the opportunity to be the dominant player in each of the markets served or targeted ultimately with 75%+ share as the market[s] evolve" but "it worried that '[i]n the core markets, MModal is causing elongated sales cycles, and pricing pressures. . . .'"

Contrary to Nuance argument that "MModal's pleading is bereft of any allegations that can be plausibly understood as an appraisal of the 'exclusionary power of the illegal patent claim in terms of the relevant market'" (Nuance Reply Brief, at 11), MModal presents several such allegations in its pleadings. For

instance, in paragraph 5 of the Counterclaims, MModal references Nuance documents that include a "Competitive MM Kill Plan" as a "To Do: Action" item as evidence that "Nuance seeks to oust MModal from the relevant market . . . by asserting a fraudulently obtained patent against its only remaining significant competitor." *See also* Counterclaims, at ¶ 4, *supra*.  In paragraphs 54-55 of the Counterclaims, MModal alleges instances of where Nuance attempted to drive "MModal from the market and decrease competition" by contacting MModal's existing and prospective customers, "including a major hospital customer of MModal, to spread false accusations of infringement and attempt to persuade them to use Nuance's voice recognition and transcription products and services instead of  MModal's."

Nuance complains that the Counterclaims do not set out why "competition in MModal's defined market would be materially different if MModal stopped using the technology claimed in the '403 patent" (Nuance Reply Brief, at 11).  However, the allegations contained in paragraph 69 describe how "Nuance's enforcement of the fraudulently procured '403 Patent and larger exclusionary conduct directed at MModal is harming and will harm competition."

Also, MModal's pleadings point to its costs and legal fees in defending against the patent as an injury to it caused by Nuance's asserting the '403 Patent in this action, another element in pleading a *Walker Process* claim. Counterclaims, at ¶¶ 115, 124. As stated in *TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1310 (Fed. Cir. 2016) (citation omitted): "[Nuance's] unlawful act was the bringing of suit based on a patent known to be fraudulently obtained. What made this act unlawful under the antitrust laws was its attempt to gain a monopoly based on this fraudulently obtained patent. [MModal's] attorney fees flow directly from this unlawful aspect of [Nuance's] act. . . [and] are precisely 'the type of loss that the claimed violations would be likely to cause.'" *See also Kearney & Tracker Corp. v. Cincinnati Milacron Inc.*, 562 F.2d 365, 374 (6th Cir. 1977). Nuance notes that MModal, not Nuance, initiated this litigation and that "[i]t is not plausible for MModal to claim that its legal fees in a litigation that it started constitute a form of antitrust injury." Nuance Reply Brief, at 11-12. However, Nuance chose, but was not required or mandated, to bring against MModal its counterclaim of infringement of the '403 Patent as it did not "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(1)(A).

MModal has "clearly articulated its claim" and has not pleaded "a per se illegality under § 2 of the Sherman Act." *Walker Process, supra* at 178. As a result, the challenged pleadings "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

Therefore, it is recommended that Nuance's Motion to Dismiss for Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6) be **DENIED.**

## B.   Motion to Strike

Nuance also moves to strike the Third, Fourth, Fifth and Sixth Defenses which, Nuance states, "all ultimately hinge on an inventorship theory. . . ." Nuance Opening Brief, at 20. For the reasons stated above, MModal has sufficiently pleaded its inequitable conduct and antitrust Counterclaims and thereby put Nuance on "fair notice of the defense[s]." *Wyshak v. City Nat. Bank*, 607 F.2d 824, 827 (9th Cir. 1979).

Therefore, it is recommended that Nuance's Motion to Strike Under Rule 12(f) also be **DENIED.**

## C.   Motion to Bifurcate and Stay Under Fed. R. Civ. P. 42(B)

Nuance argues that "federal district courts throughout the country have almost consistently found it to be in the best interest of the economy and

convenience of the court as well as of the parties to sever antitrust and similar issues from the issues of patent validity and infringement, and to stay discovery and trial of antitrust issues until the patent issues have been determined by trial." *Baxter Int'l, Inc. v. Cobe Lab., Inc.*, 1992 WL 77665, at *3 (N.D. Ill. 1992). However, as set out in *Proctor & Gamble Co. v. CAO Group, Inc.*, 2013 WL 6061103, at *2 (S.D. Ohio 2013):

> There is no universal practice of bifurcating and staying antitrust claims from patent claims in infringement cases. *See, e.g., Synopsys, Inc. v. Magma Design Automation,* Case No. 05–701, 2006 U.S. Dist. LEXIS 33751, at *10–13, 2006 WL 1452803 (D. Del. May 25, 2006) (refusing to bifurcate antitrust claims from patent claims and rejecting patentee's argument that other courts routinely do so); *Climax Molybedenum Co. v. Molychem, L.L.C.,* 414 F. Supp.2d 1007, 1014 (D. Colo. 2005) (denying bifurcation and noting "[b]ifurcation of patent and antitrust claims ... is not mandated").

Factors to be considered in a determination of whether to conduct separate trials are whether separate trials will promote convenience, expediency, and economy, whether the issues are separable, and whether separate trials would be unfair or prejudicial to any party. *Angelo v. Armstrong World Indus., Inc.,* 11 F.3d 957, 964 (10th Cir. 1993); Fed. R. Civ. P. 42(b). MModal's inequitable conduct defense and its *Walker Process* counterclaim both involve proof of Nuance's defrauding the Patent Office.[3] "The commonality between [MModal's] defense of

---

[3] Nuance confirms this commonality when it states on page 13, n.2 of its Reply Brief that the "Federal Circuit has clarified that inequitable conduct is 'nearly identical' to *Walker Process* fraud."

inequitable conduct and its *Walker Process* antitrust claim weighs against bifurcation. . . . Where an accused infringer has asserted a *Walker Process* counterclaim, a single trial may be more efficient use of judicial resources." *Climax Molybdenum Co. v. Molychem, LLC*, 414 F. Supp.2d 1007, 1014 (D. Col. 2005).

"Regardless of efficiency and separability, however, bifurcation is an abuse of discretion if it is unfair or prejudicial to a party." *Angelo, supra.* MModal asserts that it would be prejudiced by a bifurcation if its discovery into the *Walker Process* claims is stayed because it would "compromise the quality of discovery available to MModal. . . . Indeed, Nuance has already represented that emails from key witnesses have been 'archived' and are, according to Nuance, therefore no longer accessible for production in this case." MModal Response Brief, at 24.

In this case, a single trial of the patent and antitrust issues would promote the objectives of efficiency and fairness.  Therefore, it is recommended that Nuance's Motion to Bifurcate and Stay Under Fed. R. Civ. P. 42(B) be **DENIED.**

IV.   **Conclusion**

In view of the above, it is recommended that Nuance's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) and Motion to Strike Under Rule 12(f), or in the Alternative to Bifurcate and Stay Under Fed. R. Civ. P. 42(b) be **DENIED.**

Date: _April 5, 2021_

William H. Needle
Special Master